**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

WALTER M. WEEKS, SR.,
Plaintiff-Appellant,

v.

UNION CAMP CORPORATION; MARK
WATKINS; DIANA BELL; TAFT
GAYMON,
Defendants-Appellees,

and                                                            No. 98-2814

AUNDRE HUNTER; FRANK ADAMS;
FELECIA M. HUNTER,
Defendants.

STATE OF SOUTH CAROLINA HUMAN
AFFAIRS COMMISSION,
Movant.

MARK WEBSTER,
Plaintiff-Appellant,

v.

UNION CAMP CORPORATION; MARK
WATKINS; DIANA BELL; TAFT
GAYMON,
Defendants-Appellees,

and                                                            No. 98-2815

AUNDRE HUNTER; FRANK ADAMS;
FELECIA M. HUNTER,
Defendants.

STATE OF SOUTH CAROLINA HUMAN
AFFAIRS COMMISSION,
Movant.

Appeals from the United States District Court
for the District of South Carolina, at Columbia.
Joseph F. Anderson, Jr., District Judge.
(CA-97-174-3-17,
CA-97-214-3-17)

Argued: April 7, 2000

Decided: June 7, 2000

Before WILLIAMS, MICHAEL, and KING,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion. Judge King wrote a
concurring and dissenting opinion.

_____

2

**COUNSEL**

**ARGUED:** James Lewis Mann Cromer, CROMER & MABRY, Columbia, South Carolina, for Appellant. James Lynn Werner, ELLZEY & BROOKS, L.L.C., Columbia, South Carolina, for Appellees. **ON BRIEF:** Benjamin M. Mabry, CROMER & MABRY, Columbia, South Carolina; James G. Felder, FELDER, PRICKETT & MCGEE, St. Matthews, South Carolina, for Appellant. Nicole P. Cantey, ELLZEY & BROOKS, L.L.C., Columbia, South Carolina, for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Walter Weeks and Mark Webster filed suit in the United States District Court for the District of South Carolina against their former employer, Union Camp Corporation (Union Camp), and their former managers,[1] alleging violations of the Wiretap Act, reverse discrimination under Title VII of the Civil Rights Act of 1964, and state law claims of defamation and invasion of privacy all arising from Union Camp's decision to fire them based upon a conversation that was recorded by another employee, Aundre Hunter.[2] The district court granted Union Camp's motion for summary judgment. As to their

_____

[1] The individual managers are Mark Watkins, Diana Bell, Taft Gaymon, and Frank Adams. Webster and Weeks later withdrew their claims against all defendants for civil conspiracy and negligence. They also dismissed all claims against Adams. For convenience, this opinion will refer to the remaining claims against these individuals collectively with the claims against Union Camp.

[2] Hunter was a defendant in this case until the claims and counterclaims between Hunter, Webster, and Weeks were settled prior to this appeal.

3

Wiretap Act claim, Weeks and Webster argue that the district court erred because there was a triable issue of fact as to whether Union Camp knew or had reason to know that the tape recording was intentional. They also argue that the district court erred in granting summary judgment as to their Title VII claim and state law claims. For the reasons that follow, we affirm.

I.

Weeks, Webster, Hunter, and Patrick Lyle were co-workers on the same job team at Union Camp. Hunter is a black male, while Weeks, Webster, and Lyle are white males. On April 11, 1996, Hunter became unhappy after his job team gave him a partially unfavorable peer review, under which it decided that Hunter"need[ed] improvement" in the "Contributions To The Team And Department" category. (J.A. at 247.) Hunter believed that his race played a role in his negative peer review. On April 12, 1996, Hunter reported Weeks and Webster for reading magazines on the job. Hunter believed that Webster threatened to "slap the s*** out of [Hunter]" in response to the incident.[3] (J.A. at 211.)

Either on the same day or the next day, Webster, Weeks, and Lyle convened in the break room and engaged in a discussion about Hunter. Unbeknownst to them, Hunter's duffle bag was in the room with a tape recorder that was recording their conversation. Hunter claims that he inadvertently taped their conversation by accidentally switching the recorder "on" when he removed his jacket from the bag shortly before Webster, Weeks, and Lyle entered the room.[4] During

_____

[3] At deposition, Hunter was contradictory as to whether he actually heard Webster say anything to that effect. Hunter testified that he did not actually hear Webster make the comment, but that he instead interpreted Webster's body language as threatening, and, thus, imputed that statement to Webster. He later testified that "Mr. Webster did make a comment with regards to kicking the s*** out of me." (J.A. at 221.)

[4] The district court, after examining the tape recorder and the bag's contents, noted that "[t]he bag contained several hard objects." (J.A. at 559.) These hard objects included slabbing knives, safety glasses, a tape measure, a notebook, a back support belt, and a master lock, as well as the minicassette tape recorder. Hunter claims that he carried the tape recorder with him to record what was said during team meetings.

the conversation, Webster, Weeks, and Lyle apparently can be heard making racial and arguably threatening comments about and toward Hunter.[5]

On May 6, 1996, Hunter filed a charge of discrimination with the South Carolina Human Affairs Commission (SCHAC). [6] Union Camp began to investigate this charge but it still did not know about the tape. In September 1996, Wanda Nixon, who worked for SCHAC, called Diana Bell, Union Camp's Human Resources Manager, and informed her about the tape. Nixon told Bell that "Hunter had informed [Nixon] that he accidentally turned it on" and that Nixon believed Hunter's representation that the taping was inadvertent. (J.A. at 532.)

Union Camp, upon learning of the tape, consulted outside counsel to determine whether it could listen to the tape. Counsel advised Union Camp that it could listen to the tape if it was inadvertently recorded. Relying upon Nixon's statement that the taping was inadvertent, as well as Hunter's representation that the taping was an accident, Union Camp decided to listen to the tape.

After hearing the tape, Union Camp brought in Weeks, Webster, and Lyle and asked them about the conversation. Union Camp told them that it had a witness to the conversation, but did not disclose that the "witness" was the tape. Weeks, Webster, and Lyle denied making

_____

[5] The tape was of poor quality, and Union Camp had to enhance the tape in order to discern what Webster, Weeks, and Lyle said. Webster, Weeks, and Lyle's conversation included statements such as: "He got a needs improvement; he's trying to get us back"; "Black b*stard"; "I guess I'm a n*gger lover, too"; "Damn black ones"; "Andre's got a g*d damn shotgun for us . . . break out a damn oozie"; and "Eddie said, `Shut your black a** us [sic].'" (J.A. at 188-93.)

[6] This charge alleged employment discrimination under Title VII, based upon Hunter's negative peer review. It also alleged, without mentioning the tape recording, that "[o]n April 12, 1996, I became aware of racial slurs and physical threats directed at me," and that "I am aware that my white co-workers stated that I was a black b*stard and n*gger lover during a casual conversation regarding my peer review. I received negative comments on this review by these same co-workers." (J.A. at 235.)

5

many of the statements attributed to them. On December 6, 1996, Union Camp again met with Weeks, Webster, and Lyle, and gave them an opportunity to hear the tape. This time, they admitted to several of the statements. On December 27, 1996, Union Camp fired Weeks, Webster, and Lyle for racial harassment, dishonesty in their initial responses to the inquiry, and making physical threats against Hunter. Shortly thereafter, Union Camp explained the incident to its other employees in an attempt to quell rumors concerning the incident. Although Union Camp informed all of its employees about the incident, it identified Webster, Weeks, and Lyle by name only to those employees who were on the same job team as Webster, Weeks, and Lyle.

In January 1997, Webster and Weeks filed suit against Union Camp, Hunter, and other individual managers alleging violations of the Wiretap Act, reverse discrimination under Title VII, defamation, invasion of privacy, civil conspiracy, and negligence.[7] On July 28, 1998, the district court granted summary judgment in favor of Union Camp, concluding that there was no evidence that Union Camp knew or had any reason to know, when it used the tape, that Hunter had intentionally recorded the conversation. It also concluded that Union Camp's statements to its employees were privileged for purposes of defamation, that there was no evidence that Webster and Weeks were similarly situated with Hunter for purposes of Title VII, and that there was no evidence of "serious mental injury" for purposes of invasion of privacy. On August 25, 1998, the district court denied Webster and Weeks's motion for reconsideration, and on November 6, 1998, the district court entered an order disposing of the case after Webster and Weeks settled all of the claims and counterclaims that remained with respect to Hunter. On December 3, 1998, Webster and Weeks filed a joint notice of appeal.

On appeal, Webster and Weeks argue that the issue of whether Union Camp knew or had reason to know that Hunter intentionally recorded their conversation for purposes of the Wiretap Act is a jury question, and that they offered sufficient circumstantial evidence to raise a triable issue of fact as to that issue. They also argue that the

_____

[7] Lyle also filed suit against Union Camp and others, but he later settled his claims.

district court erred in granting summary judgment in favor of Union Camp as to their Title VII reverse discrimination claim because, although Webster and Weeks did not engage in similar misconduct as Hunter, Hunter's misconduct was comparably serious, and, therefore, they were similarly situated with Hunter for purposes of Title VII. Finally, Webster and Weeks argue that Union Camp exceeded its privilege with respect to their defamation claim and that they showed sufficient mental harm to support their invasion of privacy claim. We address each issue in turn.

II.

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A dispute of material fact "is `genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). When a moving party supports its motion with affidavits, the non-moving party cannot rest on its allegations, but instead must set forth specific facts showing that there is a genuine issue for trial. See id. at 248-50. "We review a grant of summary judgment de novo, applying the same standard as the district court." Baber v. Hospital Corp. of America, 977 F.2d 872, 874 (4th Cir. 1992). We view the evidence submitted by the parties in the light most favorable to the nonmoving party. See id. at 875.

III.

Webster and Weeks first argue that there is ample circumstantial evidence to raise a triable issue of fact for the jury as to whether Union Camp knew or had reason to know that Hunter intentionally recorded their conversation when Union Camp used the recording against them. For the reasons that follow, we affirm the district court's grant of summary judgment dismissing Webster and Weeks's Wiretap Act claim.

7

Section 2511 of Title 18 of the United States Code prohibits any person from "intentionally intercept[ing] .. . any wire, oral, or electronic communication." 18 U.S.C.A. § 2511(1)(a) (West Supp. 1999). It also prohibits persons from intentionally using intercepted communications if they know, or have reason to know,"that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection." 18 U.S.C.A. § 2511(1)(d) (West Supp. 1999).**8** Section 2520 provides that "any person whose wire, oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of this chapter may in a civil action recover from the person or entity which engaged in that violation such relief as may be appropriate." 18 U.S.C.A. § 2520(a) (West Supp. 1999).

"To be liable [for unlawful disclosure or use of intercepted communications under § 2511], the appellees would have to have known, or have had reason to know, that [the individual who made the recording] had a criminal or tortious motive in creating the tapes." Bast v. Cohen, Dunn & Sinclair, PC, 59 F.3d 492, 495 (4th Cir. 1995). Thus, in order to establish liability, a plaintiff must show that the "defendant kn[ew] (1) the information used or disclosed came from an intercepted communication, and (2) sufficient facts concerning the circumstances of the interception such that the defendant could, with presumed knowledge of the law, determine that the interception was prohibited in light of [the statute]." Thompson v. Dulaney, 970 F.2d 744, 749 (10th Cir. 1992). "Although a defendant may be presumed to know the law, to establish use and disclosure liability under Title III [of the Act], a defendant must be shown to have been aware of the factual circumstances that would violate the statute." Id. (internal citations omitted); see also United States v. Wuliger, 981 F.2d 1497, 1504 (6th Cir. 1992) (directing the district court to examine factors "to be considered with other circumstantial evidence in determining whether

_____

**8** Likewise, 18 U.S.C.A. § 2511(1)(c) (West Supp. 1999) applies to any person who

> intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

8

one has reason to know a fact"). A plaintiff"cannot overcome summary judgment merely by showing that it was reasonably foreseeable that the interception occurred illegally." Nix v. O'Malley, 160 F.3d 343, 349 (6th Cir. 1998) (internal quotation marks omitted).

In the present case, there is no direct evidence that Union Camp actually knew that Hunter intentionally recorded the conversation at the time it used the recording; to this day, Hunter maintains that he accidentally recorded the conversation. Thus, we are left to determine whether Webster and Weeks have raised a triable issue of fact that Union Camp had reason to know, notwithstanding Hunter's statements, that the recording was intentional.**9** See id. (stating that an unrebutted affidavit that the defendant did not believe that a recording was illegal was relevant, but not dispositive, to the question of whether he had reason to know that the interception was illegal).

Webster and Weeks rely primarily upon Wuliger to argue that Union Camp could not have plausibly believed Hunter's or Nixon's representations that Hunter inadvertently recorded the conversation, and that Union Camp should have investigated more carefully before listening to the recording. Wuliger involved an attorney who was convicted of using recordings, made by his client, of the client's wife without her knowledge after the client had falsely informed the attorney that the wife had consented to the recordings. See Wuliger, 981 F.2d at 1500. The attorney challenged his conviction partly on the ground that the district court erred in instructing the jury that reasonable foreseeability could satisfy the "reason to know" standard. The Sixth Circuit agreed and stated that reasonable foreseeability "is only a factor to be considered with other circumstantial evidence in determining whether one has reason to know a fact." Id. at 1504. The Wuliger court rejected, however, the attorney's argument that his position as an attorney required him to believe his client's assertion that the wife had consented to the recording. See id. at 1505. In doing so, the Wuliger court noted that "an attorney's professional duties may be a factor in determining whether there is reason to know that recorded information, given by the client, was illegally obtained.

_____

**9** For purposes of this analysis, we, like the district court, will assume that Hunter intentionally recorded the conversation.

9

Although an attorney must not turn a blind eye to the obvious, he should be able to give his clients the benefit of the doubt." Id.

Webster and Weeks argue that Union Camp, like the attorney in Wuliger, turned a blind eye to the obvious when it failed to investigate the plausibility of Hunter's explanation. They correctly note that Union Camp was aware, when it listened to the recording, that Hunter had complained about his peer evaluation;[10] that Hunter had recently reported Webster and Weeks for reading magazines on the job, prompting Webster to allegedly threaten Hunter; and that Hunter did not immediately inform Union Camp about the recording. They maintain that, given these circumstances, Union Camp should not have relied blindly upon Hunter's explanation, but, rather, that it should have tried harder to verify Hunter's story, perhaps by physically examining the tape recorder.

Unlike the attorney in Wuliger, however, Union Camp did not simply rely upon Hunter's bald assertion that the taping was inadvertent. Union Camp first became aware of the tape from SCHAC, which informed it, through Nixon, that it believed that Hunter was telling the truth. Indeed, SCHAC, as an independent and objective investigative body, had already listened to the recording before contacting Union Camp about its existence. Union Camp also questioned Hunter, who consistently maintained that the recording was accidental, just as he did before SCHAC. In light of these undisputed facts, we cannot say that Union Camp turned a "blind eye to the obvious," Wuliger, 981 F.2d at 1505, or that it had reason to know that Hunter had intention-

_____

[10] Union Camp was aware that Hunter blamed Webster and Weeks for the peer evaluation as early as May 6, 1996, when Hunter filed his SCHAC complaint. The SCHAC complaint does not mention the recording but it does refer to the conversation that, as it turns out, was recorded. Hunter alleged in the SCHAC complaint that, based upon the conversation, he became aware that co-workers made racial slurs and physical threats, and that "[he] received negative comments on [the peer review] by these same co-workers." (J.A. at 235.) The SCHAC complaint, however, suggests that Hunter blamed Webster and Weeks because of the conversation, and not that Hunter recorded the conversation because he blamed Webster and Weeks. Consequently, the SCHAC complaint, by itself, would not have alerted Union Camp that Hunter had a motive to record the conversation.

10

ally recorded the conversation. Union Camp relied upon information supplied by an objective investigative body -- information that Union Camp had no reason to question and that Union Camp could not easily ignore -- in deciding to use the tape. Bell knew that Nixon was offering access to the tape and that Nixon believed that Hunter was telling the truth. Bell "made the decision to follow instructions from [SCHAC]" because Bell had "no reason to doubt [Hunter]" and SCHAC "is a state agency handling the investigation" for Hunter. (J.A. at 430.) Finally, Union Camp did not blindly follow Nixon's representations; it asked Hunter to confirm the circumstances of the recording. We agree with the district court that, in the face of SCHAC's statements and Union Camp's own conversations with Hunter following SCHAC's statements, Union Camp did not act improperly.**11** Viewing the facts and reasonable inferences in the light most favorable to Webster and Weeks, we do not believe that a jury could conclude that Union Camp was aware, at the time it used the recording, of sufficient facts to allow it to determine -- beyond, perhaps, speculative guesswork -- that the recording was unlawful. Accordingly, we affirm the district court's grant of summary judgment in favor of Union Camp as to Webster and Weeks's Wiretap Act claim.**12**

_____

**11** The dissent insists that "[t]he evidence of Hunter's intent is so powerful that Union Camp could ignore it only at the company's peril." Post at 22. To say that Union Camp was "willfully blind," however, is to ignore Union Camp's reasonable decision to credit SCHAC's representations in the absence of any directly contradictory evidence, as well as Union Camp's independent attempts to question Hunter. Indeed, Union Camp's true peril would have been to ignore evidence of potentially serious misconduct, offered by an investigative body, on the basis of little more than conjecture as to Hunter's motives. Finally, the dissent suggests that our decision stands for the proposition that "three blind mice are more apt than one to discover the cheese." Post at 22. We decline, however, to assume the role of the farmer's wife, cutting off Union Camp's tail with a carving knife fashioned from the questionable conclusion that its investigation was inadequate.

**12** Union Camp also argues that Weeks and Webster's settlement with Hunter, which resulted in the voluntary dismissal of their Wiretap Act claim against Hunter, precludes their Wiretap Act claim against Union Camp under the doctrine of res judicata. In light of our disposition of the underlying Wiretap Act claim against Union Camp, however, we do not address whether res judicata applies in the present case.

11

IV.

Webster and Weeks next argue that the district court erred in granting summary judgment in favor of Union Camp as to their Title VII reverse discrimination claim. They argue that there is ample evidence that they, as white males, were treated less favorably than Hunter because they were fired for misconduct that was comparably serious to misconduct for which Hunter was not disciplined. Webster and Weeks maintain that although Hunter's alleged misconduct was not similar in nature to their misconduct, it was similar in seriousness, and, thus, they were similarly situated for purposes of Title VII. We disagree.

To establish a prima facie case of disparate discipline under Title VII, a plaintiff generally must show that (1) he engaged in prohibited conduct similar to that of a person of another race, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person. See Taylor v. Virginia Union Univ., 193 F.3d 219, 234 (4th Cir. 1999), cert. denied, 120 S. Ct. 1243 (2000). The defendant may then offer a non-discriminatory reason for the disparity, which then triggers the plaintiff's obligation to rebut the proffered explanation. See Cook v. CSX Transp. Corp., 988 F.2d 507, 511 (4th Cir. 1993). In determining similarity for the purposes of this test, Webster and Weeks must show"that the prohibited conduct in which [they] engaged was comparable in seriousness to misconduct of employees outside the . . . class." Id.

Although Webster and Weeks correctly argue that Title VII does not require exact identity between their conduct and Hunter's conduct, see id. at 511 (discussing the "need to compare only discipline imposed for like offenses in sorting out claims of disparate discipline under Title VII and of the reality that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances"), Webster and Weeks have failed to show that their conduct was comparably serious to Hunter's.[13] The most serious, and comparable, of

_____

[13] Some courts use a "background circumstances" test in reverse discrimination cases to determine whether the defendant is "that unusual

12

Hunter's actions is his alleged dishonesty with respect to the recording.**14** However, even if we assume that Hunter lied about the accidental nature of the recording, there is no evidence that Union Camp actually knew that Hunter was lying. As discussed above, Union Camp has never had any concrete evidence that Hunter was dishonest. Indeed,

_____

employer who discriminates against the majority." Parker v. Baltimore & O.R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981); see also Mills v. Health Care Serv. Corp., 171 F.3d 450, 457 (7th Cir. 1999); Duffy v. Wolle, 123 F.3d 1026, 1036-37 (8th Cir. 1997); Reynolds v. School Dist. No. 1, 69 F.3d 1523, 1534 (10th Cir. 1995); Notari v. Denver Water Dep't, 971 F.2d 585, 588-89 (10th Cir. 1992); Murray v. Thistledown Racing Club, Inc., 770 F.2d 63, 66-67 (6th Cir. 1985). The Third Circuit recently rejected this test in favor of a standard under which

> a plaintiff who brings a "reverse discrimination" suit under Title VII should be able to establish a prima facie case in the absence of direct evidence of discrimination by presenting sufficient evidence to allow a reasonable fact finder to conclude (given the totality of the circumstances) that the defendant treated plaintiff less favorably than others because of his race, color, religion, sex, or national origin.

Iadimarco v. Runyon, 190 F.3d 151, 163 (3d Cir. 1999) (internal quotation marks omitted). We have not taken a position on this issue. See Lucas v. Dole, 835 F.2d 532, 534 (4th Cir. 1987) ("Although the D.C. Circuit has imposed a higher prima facie burden on majority plaintiffs, we expressly decline to decide at this time whether a higher burden applies."). Regardless of which standard we apply to the present case, however, we conclude that Webster and Weeks have failed to raise a triable issue of fact that they were similarly situated with Hunter so as to implicate Title VII.

**14** Union Camp's stated reasons for firing Webster and Weeks were that Webster and Weeks made statements that were arguably racist and threatening to Hunter; and that Webster and Weeks "were less than forthcoming" about those statements when Union Camp initially asked about them, only to change their answers when Union Camp confronted them with the tape. Webster and Weeks argue that Hunter's conduct is comparably serious because he allegedly lied about the inadvertent nature of the recording, refused to play the tape without his attorney present, was once thirty minutes late to a meeting, and once cursed at a manager during a later meeting.

13

to this day, Hunter has continuously maintained his innocence. By contrast, Webster and Weeks initially denied making the statements in the recording and then later admitted to making several of those statements. Union Camp, therefore, had at least some hard evidence of dishonesty and inconsistency by Webster and Weeks in responding to the investigation. Consequently, Union Camp clearly had a reasonable basis for distinguishing between Webster, Weeks, and Hunter because the evidence available with respect to Hunter was significantly different than that which was available against Webster and Weeks.**15** Because Hunter was not similarly situated with Webster and Weeks, we affirm the district court's grant of summary judgment in favor of Union Camp with respect to Webster and Weeks's Title VII reverse discrimination claim.

V.

Webster and Weeks next argue that Union Camp defamed them when it told its employees about their firing. Webster and Weeks assert that the district court should have allowed their state law defamation claim, as well as the defense of privilege, to go to the jury. We agree with the district court that Webster and Weeks failed to raise a triable issue of fact as to these issues.

Under South Carolina law, a plaintiff can recover for defamation "if he can show that the statement (1) had a defamatory meaning; (2) was published with actual or implied malice; (3) was false; (4) was published by the defendant; (5) concerned the plaintiff; and (6) resulted in presumed damages or special damages to the plaintiff." Parker v. Evening Post Publ'g Co., 452 S.E.2d 640, 644 (S.C. Ct. App. 1994). Under South Carolina law, communications between officers, or agents of the same corporation generally enjoy a qualified privilege. See Bell v. Evening Post Publ'g Co., 459 S.E.2d 315, 317 (S.C. Ct. App. 1995). The elements of a qualified privilege are "good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only." Id. "One publishing defamatory words under

---

**15** Moreover, the nature of Webster and Weeks's infractions -- especially the racial component and the apparent physical threats involved -- likewise set their infractions apart from Hunter's alleged infractions.

14

a qualified or conditional privilege is only liable upon proof of express malice." Fulton v. Atlantic Coast Line R. Co., 67 S.E.2d 425, 429 (S.C. 1951). "Actual malice means that appellant acted with ill-will towards the plaintiff, or that it acted recklessly or wantonly, meaning with conscious indifference toward plaintiff's rights." Padgett v. Sun News, 292 S.E.2d 30, 34 (S.C. 1982) (internal quotation marks omitted). To establish malice, however,

> [i]t is not necessary that evidence must be offered of malignity or illwill, nor that those facts should be found. The time, place, and other circumstances of the preparation and publication of defamatory charges, as well as the language of the publication itself, are admissible evidence to show that the false charge was made with malice.

Fulton, 67 S.E.2d at 429. Moreover, "[w]here the person exceeds his privilege and the communication complained of goes beyond what the occasion demands that he should publish, and is unnecessarily defamatory of plaintiff, he will not be protected." Id. Consequently, "[t]he employer-employee privilege does not protect unnecessary defamation." Moshtaghi v. The Citadel, 443 S.E.2d 915, 920 (S.C. Ct. App. 1994). "While abuse of the conditional privilege is ordinarily an issue reserved for the jury, in the absence of a controversy as to the facts . . . it is for the court to say in a given instance whether or not the privilege has been abused or exceeded." Woodward v. South Carolina Farm Bureau Ins. Co., 282 S.E.2d 599, 601 (S.C. 1981) (internal citations omitted).

Union Camp's statement to its employees regarding the termination of Webster and Weeks was conditionally privileged because it occurred within the context of a communication between agents of the same corporation; there is no evidence that anyone outside of Union Camp was present when Union Camp informed its employees of Webster and Weeks's termination. Moreover, there was a common interest to be upheld because rumors were emerging among the employees that Union Camp needed to quell. The only issue, therefore, is whether Union Camp exceeded its privilege by disclosing the information in an improper manner or with malice. Compare Bell, 459 S.E.2d at 317 (deciding, as a matter of law, that Evening Post did not act with malice or exceed its privilege because there was no evi-

15

dence that Evening Post acted in anything other than "a proper effort to protect its business interests and employees" in investigating sexual harassment), and Woodward, 282 S.E.2d at 601 (finding abuse of privilege where a letter, sent in the context of settlement negotiations, "gratuitously volunteered" the "obviously unnecessary" statement that a doctor who treated the claimant "often overtreats his patients").

In the present case, David Fary, who made the announcement to Union Camp employees, testified at deposition that Union Camp decided to make the announcement because

> there was a great uncertainty within the organization as to where things stood, what had happened to three people, people were aware of conflicts within the teams, that we felt it appropriate at that point in time to try to share some clarifying information and to let the teams know where things stood, where we were moving forward from here and that type thing.

(J.A. at 551.) Fary based his statement upon an outline that his lawyers gave him.[16] Bell testified that Fary informed each "team" separately and that he only identified Weeks and Webster in his statement to `B' team because that was the team of which they were members.

Based upon Bell and Fary's undisputed testimony, we have no difficulty concluding that Union Camp did not exceed its privilege. Union Camp needed to explain the circumstances of the incident to quell rumors and uncertainty that was emerging among its employees.

_____

[16] Based upon Fary's handwritten notes from the `B' team meeting, it appears that he intended to discuss "the issues involved," "why it took so long," and "learning from the situation." (J.A. at 554.) He appears to have told them that "much of it should be considered confidential," that Union Camp "conducted a very thorough investigation" and that "it has been concluded that [Webster, Weeks, and Lyle] were involved in . . . harassment and physical threats. This information was obtained from a taped conversation . . . and was part of a harassment complaint brought by a fellow employee. The three are no longer employed based on harassment and physical threats and less than full disclosure of their knowledge of the situation." (J.A. at 554.)

16

In doing so, Union Camp limited the scope of information it gave to its employees by revealing Webster and Weeks's identities only to members of `B' team, who had a distinct interest in understanding what happened to their fellow team members. Webster and Weeks have not offered any evidence to suggest that Union Camp had any motive beyond addressing these rumors, that Fary revealed their names to anyone other than members of `B' team, or that Fary revealed more information than necessary to resolve the situation. Because there is no evidence that Union Camp exceeded its privilege or that it acted with malice, we affirm the district court's grant of summary judgment on this issue.

VI.

Finally, Webster and Weeks argue that Union Camp invaded their privacy by using Hunter's illegally recorded tape. The district court, in disposing of this issue, stated that "Plaintiffs have failed to meet their burden under this cause of action. Plaintiffs have produced no evidence that the defendants' use of the tape caused them `serious mental injury,' and the court must therefore dismiss this cause of action." (J.A. at 567.) For the reasons that follow, we affirm the district court on this issue.

Under South Carolina law, a cause of action for invasion of privacy comes in three forms: wrongful appropriation of personality, wrongful publicizing of private affairs, and wrongful intrusion into private affairs. See Snakenberg v. Hartford Casualty Ins. Co., 383 S.E.2d 2, 5 (S.C. Ct. App. 1989). It is the latter form of the action, wrongful intrusion into private affairs, upon which Webster and Weeks base their claim. A wrongful intrusion claim requires an (1) intrusion; (2) into that which is private; (3) that is substantial and unreasonable enough to be legally cognizable; and (4) intentional.[17] See id. Notably,

_____

[17] "For purposes of civil liability, an act is intentional if (1) it is done willingly; and either (2) the actor desires the result of his conduct, whatever the likelihood of that result happening; or (3) the actor knows or ought to know the result will follow from his conduct, whatever his desire may be as to that result." Snakenberg v. Hartford Casualty Ins. Co., 383 S.E.2d 2, 6 (S.C. Ct. App. 1989).

17

> [i]n order to constitute an invasion of privacy, the defendant's conduct must be of a nature that would cause mental injury to a person of ordinary feelings and intelligence in the same circumstances. The law protects normal sensibilities, not heightened sensitivity, however genuine. Whether the conduct in question meets this test is, in the first instance, a question of law for the court.

Id. (internal citations omitted). "When a plaintiff bases an action for invasion of privacy on `intrusion' alone, bringing forth no evidence of public disclosure, it is incumbent upon him to show a blatant and shocking disregard of his rights, and serious mental or physical injury or humiliation to himself resulting therefrom." Rycroft v. Gaddy, 314 S.E.2d 39, 43 (S.C. Ct. App. 1984).

Webster and Weeks have failed to point to any evidence of serious mental harm.[18] Indeed, our own examination of the record reveals that Webster and Weeks's only evidence of serious mental injury appears in the form of identical affidavits, filed by each, stating that "the statements made by Dave Fary to the workforce at Union Camp about the termination of the deponent have caused the deponent severe mental damages including distress, embarrassment, humiliation, mental anguish, and depression." (J.A. at 158, 133.) These conclusory affidavits, by themselves, are not enough to create a triable issue of fact. See Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) ("[S]ummary judgment affidavits cannot be conclusory."). Because Webster and Weeks have failed to offer sufficient evidence to support their allegation of serious mental injury, we affirm the district court's grant of summary judgment on this issue.

_____

[18] In their briefs, Webster and Weeks argue simply that "[i]t should be obvious to any reasonable person that such an offense against one's privacy occurring in a society which places such an enormous value on this liberty would cause humiliation and mental injury in any person of ordinary sensibilities." (Reply Br. at 29.) This conclusory assertion, absent other evidence, is simply insufficient to defeat summary judgment.

18

VII.

In conclusion, Webster and Weeks have failed to raise a triable issue of fact that Union Camp knew or had reason to know that Hunter intentionally recorded Webster and Weeks's conversation. Thus, the district court properly granted summary judgment in favor of Union Camp with respect to Webster and Weeks's Wiretap Act claims.

Webster and Weeks have also failed to raise a genuine issue of material fact that they are similarly situated with Hunter under Title VII, or that Union Camp exceeded its privilege in disclosing their identities and explaining their firings to members of their job team. Finally, Webster and Weeks have failed to offer evidence of serious mental injury sufficient to sustain their invasion of privacy claim. For these reasons, we affirm the district court's grant of summary judgment on these claims.

AFFIRMED

KING, Circuit Judge, concurring in part and dissenting in part:

I agree that the district court correctly entered summary judgment for Union Camp insofar as the plaintiffs' action is premised on alleged violations of Title VII or the law of South Carolina. I therefore join in those portions of the majority's opinion affirming the judgment below with regard to the reverse discrimination and state-law claims.

I respectfully disagree, however, with the majority's conclusion that summary judgment was warranted for Union Camp on the plaintiffs' claim under the Wiretap Act. Accordingly, I dissent from Part III of the majority's opinion.

I.

A.

It is the rare case that begets a penitent eavesdropper; far more often, the alleged interloper is unwilling to admit that he has inten-

19

tionally intercepted a private conversation. This case is no different: Hunter steadfastly denies having activated his tape recorder on purpose, and there is no direct evidence to refute his protestations of innocence.

The circumstantial evidence of Hunter's culpable intent, however, is overwhelming. Indeed, had Hunter been prosecuted and convicted of criminally violating the Wiretap Act, see 18 U.S.C. § 2511(4), the evidence would plainly have been sufficient to sustain the jury's verdict. Consider the following circumstances surrounding the taping of the plaintiffs' conversation:

(1) Hunter's possession of the tape recorder . Hunter explained that the recorder was a birthday gift from his wife, used only to tape end-of-shift meetings that occurred infrequently, i.e., about four times per year. It appears that no such meeting was scheduled near the time of the events in question, as Hunter could not recall when he had last used the recorder;

(2) The timing. The taping occurred within thirty-six hours of two major incidents involving Hunter and the plaintiffs, beginning with the volatile aftermath of the peer evaluation and concluding with Hunter's complaint that the plaintiffs were reading magazines on the job (which itself culminated in Webster's vague threat of physical violence);

(3) The motive. Hunter blamed his unsatisfactory evaluation on the plaintiffs and Lyle, and the district court found that Union Camp was aware of Hunter's animus. J.A. 560;

(4) The opportunity. Webster testified that he brought his lunch "90-95 percent of the time," a habit of which his co-workers were bound to be aware. The most logical alternative to walking to the plant cafeteria was eating in the break room, where Hunter had placed his duffel bag;

(5) The setup. Hunter made a point of opening the door to the break room and telling the plaintiffs that he was going to the cafeteria (and thus leaving their presence);

20

(6) <u>Hunter's past behavior</u>. Hunter was prone to preserving records of job-related incidents for later reference, as evidenced by the list of perceived wrongs he produced at his peer evaluation;

(7) <u>Hunter's actions regarding the tape</u>. Although Hunter met with company representatives on a number of occasions following the break room episode, the tape's existence was not revealed to Union Camp until nearly five months after the fact, and only then by a third party. Indeed, even Hunter's close friend and co-worker, Frank Adams, did not learn of the tape until after this lawsuit was filed. Hunter's efforts at concealment strongly suggest that he had something to hide, namely that he had acted inappropriately and unlawfully by surreptitiously recording the plaintiffs' conversation;

(8) <u>The implausibility of Hunter's explanation</u>. It strains the limits of credulity to accept the premise that a tape recorder button can be "accidentally" pressed down just by removing a jacket from a duffel bag. Even granting the possibility, it is highly unlikely that -- of all the buttons that <u>could</u> be activated-- it would be the "Record" button that <u>was</u>. Moreover, if the recording were truly an accident, it seems probable that Hunter would not have listened to the tape, but would have simply rewound it.

In short, if a prosecutor were attempting to convince a criminal jury beyond a reasonable doubt that Hunter intended to record the plaintiffs' conversation, she would be delighted to have such a solid case. Were Hunter convicted, that same prosecutor would lose precious little sleep worrying that we might reverse the jury's verdict under <u>Glasser v. United States</u>, 315 U.S. 60, 80 (1942), as unsupported by substantial evidence.

Of course, this is not a criminal case, and it is not a proceeding against Hunter. But Union Camp is liable to the plaintiffs for using or disclosing the contents of the clandestine recording -- a criminal act abhorrent to civilized custom -- if it reasonably should have known of its alleged nature. Union Camp clearly had every reason to know, but the plaintiffs need only demonstrate at the outset that it was more likely than not that Hunter made the recording intentionally. Once Hunter's culpability has been proved to the jury's satisfaction, it could then proceed to the ultimate issue of what Union Camp

21

should have known -- which also is subject to proof by a mere preponderance of the evidence.

B.

The evidence of Hunter's intent is so powerful that Union Camp could ignore it only at the company's peril. The majority, however, sanctions Union Camp's willful blindness by permitting it to rely solely on (1) the opinion of the state's case agent, whose remarkable talent for divining the truth is nowhere documented; and (2) the representations of Hunter himself, who can hardly be thought a disinterested witness. See ante at 10-11. Needless to say, I am not comforted by the majority's apparent conclusion that three blind mice are more apt than one to discover the cheese.

II.

If a jury were to find that Union Camp disclosed or otherwise used the contents of the tape recording "having reason to know that the information was obtained" in violation of the Wiretap Act, see 18 U.S.C. §§ 2511(1)(c)-(d), we would be compelled to affirm its verdict unless "reasonable persons could reach no other conclusion" than that embraced by the majority today. Spicer v. Virginia Dep't of Corrections, 66 F.3d 705, 711 (4th Cir. 1995) (en banc) (quoting Coates v. Daugherty, 973 F.2d 290, 293 (1992)). In light of the evidence before us, I submit that a verdict in the plaintiffs' favor would be considerably more than reasonable; it would be sensible.

22